POSNER, Circuit Judge.
The plaintiffs (“Olympia” for short) obtained a $36 million antitrust judgment *796 (after trebling) against Western Union Telegraph Company, the principal subsidiary of Western Union Company. Western Union Telegraph wanted a stay of execution of judgment pending appeal to this court, and ordinarily to get a stay it would have had to post a supersedeas bond for the full amount of the judgment. Fed.R. Civ.P. 62(d). It urged the district judge to allow alternative security, on the ground that it could not post a $36 million bond. Although Western Union Telegraph is a large company, with total assets nominally worth $2 billion, it is financially distressed and illiquid. It could get a bond only by persuading a bank to issue a letter of credit to the bonding company, and it contended that no bank would do this. The district judge allowed alternative security to be posted, consisting of a pledge of $10 million in cash, $10 million in accounts receivables, and a security interest, which Western Union Telegraph represented to be worth about $70 million, in some of the company’s physical assets. Olympia has appealed the judge’s order (a classic “collateral order,” appealable separately from the final judgment on the merits, see, e.g., Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); Redding & Co. v. Russwine Construction Corp., 417 F.2d 721, 724-26 (D.C.Cir.1969)), contending that the posting of a supersedeas bond is mandatory and in the alternative that the alternative security required by the district judge is inadequate.
Although a textual argument can be made that Rule 62(d) makes the posting of a supersedeas bond mandatory, so that if a bond is not posted the judgment creditor can begin to execute the judgment immediately even though an appeal is pending, we agree with the contrary conclusion in Federal Prescription Service, Inc. v. American Pharmaceutical Ass’n, 636 F.2d 755, 757-60 (D.C.Cir.1980). (The dictum in Donovan v. Fall River Foundry Co., 696 F.2d 524, 526 (7th Cir.1982), on which the plaintiffs rely, is not inconsistent with Federal Prescription Service. We merely said that posting a bond entitles the appellant to a stay of execution pending appeal; that is of course what Rule 62(d) says; if he does not post a bond, he risks the district judge’s deciding to deny a stay.) To the technical reasons which that court advanced for rejecting a literal reading of Rule 62(d) we add that an inflexible requirement of a bond would be inappropriate in two sorts of case: where the defendant’s ability to pay the judgment is so plain that the cost of the bond would be a waste of money; and — the opposite case, one of increasing importance in an age of titanic damage judgments— where the requirement would put the defendant’s other creditors in undue jeopardy. Federal Prescription Service was the former sort of case; this case, as we shall see, is the latter sort. Either is a candidate for alternative security, as recognized in Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc., 600 F.2d 1189, 1191 (5th Cir.1979).
The hard questions raised by this appeal are whether a supersedeas bond was in fact unobtainable and whether the alternative security approved by the district judge is adequate. It is reasonably clear that a bond could not have been obtained without a letter of credit, but as to whether any bank would have issued such a letter we have only the evidence that no member of Western Union Telegraph’s 31-bank lending consortium would do so. Maybe another bank would have done so. Since, however, the members of the consortium are the banks that know the company best, their refusal may be probative of how other banks would act. Sometimes, it is true, a bank will make a loan that the borrower’s established lenders consider too risky. The bank hopes to get into the borrower’s good graces and perhaps win his future business. But Olympia does not argue that this was a realistic possibility here. Public regulation makes banks behave as if risk averse and perhaps Western Union Telegraph is too shaky to make banks that are unfamiliar with its business eager to lend to it.
A more serious problem is that Western Union Telegraph based its inquiry about obtaining a letter of credit on the premise *797 that it would not have to pay more than the standard fee, which (we surmise) is 1 percent of the face amount of the letter of credit; if it had offered a higher fee it might have generated greater interest on the part of prospective issuers. But as Olympia makes nothing of this point, neither shall we; and maybe if Western Union Telegraph had offered a higher fee this would have been taken as an acknowledgment of unusual hazards, and have frightened away potential issuers. At some level of course the fee would break the company.
If as we shall assume Western Union Telegraph could not have obtained a letter of credit on reasonable terms, the alternatives facing the district judge were either to allow Olympia to execute the judgment by seizing and selling unencumbered assets of Western Union Telegraph, or to allow the posting of alternative security. The propriety of the second course is implicit in our conclusion that Rule 62(d) does not impose an ironclad requirement of a supersedeas bond, and makes the issue one of the adequacy of the alternative security that the district judge allowed the defendant to post. On that issue we note first that the parties and the district judge made little effort to explore the possibility of a bond that would secure a part of Olympia’s judgment — perhaps the $12 million in compensatory damages. The punitive damages in the award are a windfall to Olympia, their purpose (their principal purpose, anyway) being to punish and deter antitrust violators rather than to compensate the victims. The element of windfall mitigates our concern that if Western Union Telegraph declared bankruptcy, Olympia might never collect a penny of the punitive damages, even if there were some money for other creditors. And well it might not, for there is authority for disallowing claims of punitive damages in bankruptcy where necessary to allow other creditors to be paid in full (a qualification stressed in In re American Federation of Television & Radio Artists, 32 B.R. 672, 674 (Bankr.S.D.N.Y.1983)). The idea is that to allow a claim for punitive damages in these circumstances would make innocent creditors bear the burden of the debt- or’s wrongdoing. See In re GAC Corp., 681 F.2d 1295, 1301 (11th Cir.1982); In re Colin, 44 B.R. 806, 810 (Bankr.S.D.N.Y.1984).
We need not decide whether this is a sound analysis. It is enough that the loss of Olympia’s claim for punitive damages, if that were a consequence of Western Union Telegraph’s declaring bankruptcy, would not so impair the deterrent effects of antitrust liability that we should require that the district judge use superhuman efforts to secure this part of Olympia’s antitrust judgment no matter what the costs to the other creditors of Western Union Telegraph. For, speaking realistically, bankruptcy would be punishment enough for the company’s violation of the antitrust laws, if it did violate them, even if as a result of bankruptcy the award of punitive damages were wiped off the books. Sometimes, it is true, a corporation emerges from bankruptcy with all creditors paid and something_ left over for the shareholders. But this is rare, and, more important, would be a case where the punitive damages or some portion of them could be paid without impairing the interests of other creditors; so there would be no danger of the shareholders’ escaping any part of the judgment. If the punitive damages were not collectible it would mean that the shareholders’ equity had been completely wiped out; and that is the greatest punishment that can be visited on a corporation. It is not realistic to imagine that creditors will take effective steps to prevent their borrower from violating the antitrust laws (or other laws for the violation of which punitive damages can be awarded), knowing that they may have to bear the burden of an award of punitive damages should they fail to do so. It would be different if the creditors (more realistically, a committee of the principal lenders) controlled the company at the time of the alleged violations, but Olympia makes no such argument. And even then, any increment in deterrence from trying to sock the creditors with an award of punitive damages *798 would have to be traded off against the deadweight losses of bankruptcy. Of course if the creditors came to own the company, as they might in a reorganization in bankruptcy, they would be liable to the extent of the value of their investment for any future antitrust violations by the company.
A more serious problem with the alternative security is that the district judge has allowed Western Union Telegraph Company to make cash transfers to its parent, Western Union Company, even though the parent is probably not liable on the judgment. A parent corporation, like an individual shareholder, ordinarily is not liable for the debts of a subsidiary beyond the parent's investment in the subsidiary. It has the same protection of limited liability that an individual shareholder would have; whether the conditions for “piercing the corporate veil” might be satisfied here we need not consider. The cash transfers of which Olympia complains may be necessary to enable Western Union to keep its lenders from calling their loans. If they did call them, the whole Western Union enterprise might collapse, including the defendant subsidiary. This is not certain. The stock of Western Union Telegraph is an asset of its parent, and can be reached by the parent’s creditors, who might therefore come to own the subsidiary, but this would not entitle them to levy on the subsidiary’s assets. In re Manville Forest Products Corp., 31 B.R. 991, 994 (S.D.N.Y.1983). All this is a little too pure, though; solvent subsidiaries often get sucked into the parent’s bankruptcy, as in the Manville case just cited. See also Blumberg, The Law of Corporate Groups § 13.03 (1985). But even though allowing the cash transfers to be made may therefore benefit the subsidiary as well as the parent, it is not clear to us why the judgment should not follow the assets of the subsidiary when they are transferred to the parent.
Except for the failure to make the judgment do this, our reservations about the district judge’s order are not of such gravity as would warrant our setting the order aside. The judgment he had to make was discretionary — equitable—judgmental — in a strong sense which limits the scope of appellate review. He had to balance the interest of Olympia as a judgment creditor against the interest of the other creditors of Western Union Telegraph who might be harmed if Olympia were allowed to execute its judgment or tie up more of the defendant’s assets. If, as Olympia requests, all of Western Union Telegraph’s unencumbered assets were made over to Olympia as security for its judgment, the position of Western Union Telegraph’s unsecured creditors, including banks to which it owes in excess of $300 million, would become perilous. A judgment creditor is a bona fide creditor, but the court that issues the judgment is not required to ignore the interests of other creditors when deciding how much security to make the defendant post as a condition of being allowed to stave off execution of the judgment pending appeal. This becomes apparent when we consider the contingent nature of such a creditor’s claim if an appeal is filed, as in this case. If the judgment is reversed, the claim is invalidated ab initio. Of course other creditors’ claims may be contingent too; nevertheless it would be a painful irony for us to impair and perhaps even destroy the other creditors’ claims merely to remove every element of hazard from a claim that may not survive the process of appeal.
While the district judge might have pressed Western Union a bit harder than he did to come up with additional liquid assets to pledge to Olympia, he did not so far exceed the reasonable bounds of judgment as to require us to intervene — with one exception, made urgent by events since he issued his order. Western Union has announced the sale, effective April 30, of a division of Western Union Telegraph for $155 million in cash. Olympia would like us to forbid the transfer of any of this cash to the parent, so that it can remain as an asset of the subsidiary to satisfy the judgment against it. We decline to do this. *799 The parent is shaky, too (its shaky subsidiary is its principal asset). It needs the cash from the sale of the division to pay off some of its bank debt. But as we said earlier, the judgment should follow the assets. We herewith modify the district judge’s order so that it forbids Western Union Telegraph to make any cash transfer, whether in the form of dividends or otherwise, to its parent, unless it obtains Western Union’s agreement to be bound on the antitrust judgment to the extent of any cash transferred, or posts a supersedeas bond (or, what Olympia concedes would be the equivalent, pledges a letter of credit) securing the entire judgment.
We shall also accelerate the date of oral argument of the appeal on the merits in order to minimize the period of jeopardy for Olympia's judgment. And, needless to say, Olympia is free at any time to ask the district judge to modify the security order in light of changed circumstances. (We were told at argument that Western Union would announce a major financial restructuring in about two weeks.) But we reject any suggestion that the district judge and we should be indifferent to the possible consequences of a literal interpretation of Rule 62(d). Olympia is not Western Union Telegraph’s only creditor, and given that its status as creditor is conditional on its prevailing in the appeal from the antitrust judgment we cannot criticize the district judge for his unwillingness to risk throwing Western Union Telegraph into bankruptcy merely to increase (maybe) the probability that Olympia can collect all of its judgment if the judgment is affirmed. Apart from the impact that a declaration of bankruptcy might have on other creditors of Western Union Telegraph, there are the considerable deadweight losses which bankruptcy creates. See studies cited in American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589, 597 (7th Cir.1986). The bigger the bankruptcy — and a bankruptcy of Western Union Telegraph would be one of the biggest — the bigger those costs. Of course the financial restructuring of Western Union that is in progress as we write may impose similar costs; and as bankruptcy is a legally authorized method of sorting out the claims of competing creditors, there is an argument for allowing Olympia to perfect its claim and take its chances, in bankruptcy, with the other creditors, if that is what Olympia wants to do. But we are reluctant to conclude that a district judge commits an abuse of discretion by refusing to allow a plaintiff to execute a judgment in circumstances where the execution may cause a billion-dollar bankruptcy, merely because the alternative security to a supersedeas bond that the defendant apparently cannot post provides a slightly inferior protection of the plaintiff’s interest.
Especially are we reluctant to so conclude in circumstances where allowing the plaintiff to execute his judgment before the defendant could appeal might not even increase the probability of the plaintiff’s collecting the judgment in full. Depending on what assets were seized the attempt at execution might so interfere with Western Union Telegraph’s business or so jeopardize the collectibility of other creditors’ claims as to throw the company into bankruptcy, at which point Olympia would be just a judgment creditor. A judgment creditor is an unsecured creditor; and though a federal court’s judgment can of course give rise to a lien, see 28 U.S.C. § 1962; 4 Collier on Bankruptcy ¶ 547.12 at p. 547--51 n. 21 (15th ed., King, 1985), and a lien creditor has priority over unsecured and some secured creditors, see UCC §§ 9-301(l)(b), (3), there is no suggestion that Olympia has obtained or can obtain a lien by virtue of the judgment in this case. Unsecured creditors usually fare poorly in bankruptcies. Maybe, then, this is all a big game of “chicken” in which Olympia’s object is to force a settlement before the appeal is heard by making it difficult for Western Union Telegraph to prosecute the appeal without declaring bankruptcy, even though Olympia knows that if Western Union Telegraph does not flinch, and declares bankruptcy, Olympia’s claim may prove to be uncollectible. All this is speculation but that is all the more reason for not disturb *800 ing the district judge’s exercise of discretion beyond the modest extent that we have indicated.
Modified and, as Modified, Affirmed.